# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59998-8-II |
| Respondent, | |
| v. | |
| DYRELL JONTAE ROBERT SWINSON, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, C.J. — Dyrell Swinson, a Black man, was convicted of murder in the second

degree, two counts of assault in the first degree, assault in the second degree, and harming a police

dog. At trial, the State introduced a video interview of Myles McRoy, a friend of the victim, who

is also Black. The video depicted McRoy calling Swinson numerous racial slurs.

Swinson argues that the trial court erred in admitting the video of McRoy.[1] We conclude

that the trial court abused its discretion by admitting the video of McRoy and the error was not

---

[1] Swinson also argues that: (1) the State engaged in race-based prosecutorial misconduct by offering the video as evidence; (2) the State also engaged in prosecutorial misconduct by misstating the law of self-defense; (3) the trial court improperly commented on the evidence; (4) cumulative error deprived him of his right to a fair trial; (5) the trial court erred by including his juvenile adjudications in his offender score at sentencing under RCW 9.94A.525(1)(b); and (6) the trial court separately erred by including some of his prior convictions in his offender score because the information did not allege, and a jury did not find, that (a) his juvenile adjudications occurred, (b) his prior offenses did not washout, and (c) his federal conviction could be used to increase his sentence.

Because we reverse and remand on judicial error, we decline to address these arguments or facts related to them.

harmless, entitling Swinson to a new trial. Accordingly, we reverse Swinson's convictions and remand for a new trial.

FACTS

I.      THE NIGHT BEFORE THE SHOOTING

Swinson and Jake Red were longtime friends, but they had a tumultuous friendship. Swinson and Red would "[u]sually . . . go to the mall and hang out by the casino or waterfront" and "drink and get high on cocaine." Rep. of Proc. (RP) (Nov. 14, 2023) at 2039. Red would lose his temper and get into fights with others at times. In one instance, Red had previously "pulled out a gun and fired a shot in [the] direction" of a person after losing a fight with them. RP (Nov. 14, 2023) at 2040.

On April 11, 2020, the night before the shooting, Swinson and Red "were doing lines of coke" and "were just chilling." RP (Nov. 14, 2023) at 2046. Swinson left Red's place early in the morning on August 12. Swinson discovered that Red had left his phone in his car. There were "a lot of messages [and calls] coming in," so Swinson "looked at one of the messages." RP (Nov. 14, 2023) at 2047. Swinson got upset because he believed Red was in contact with the mother of Swinson's daughter.

Swinson went back to return Red's phone. Swinson confronted Red about him talking with the mother of Swinson's daughter. Red explained that he was talking to his girlfriend who shared the same first name as Swinson's daughter's mother. Swinson told Red that he had made a mistake, but Red "was still mad that [Swinson had gone] through his phone." RP (Nov. 14, 2023) at 2050. Swinson left afterward.

II. THE SHOOTING

The next morning, Swinson met up with Red and McRoy, a shared friend, at McRoy's house. The three were "drinking and doing lines of coke." RP (Nov. 14, 2023) at 2051. While they were at McRoy's house, Red "was on the phone, arguing with one of his old friends." RP (Nov. 14, 2023) at 2052. Red "lost his temper over the phone" and was saying that he was "going to have a shootout with [his old friend] when he [saw] him [next]." RP (Nov. 14, 2023) at 2053.

Swinson decided to leave McRoy's house and go to the cemetery to visit his deceased cousin. Red and McRoy met up with Swinson at the graveyard.

While at the cemetery, the three continued to drink and smoke. According to Swinson, McRoy brought up the incident from the night prior, which caused Red to get upset. Red wanted to fight Swinson, which made Swinson uncomfortable, so he left. But according to McRoy, there was no tension between Swinson and Red. Swinson even said that he loved both Red and McRoy.

Red and McRoy left the cemetery to go to Red's house to pick up some paperwork for the Department of Licensing (DOL); Red was getting a new identification card. Swinson met McRoy and Red at the DOL office. It is unclear whether the three had planned to meet at the DOL office. Swinson ended up parking next to Red in the DOL parking lot.

McRoy's and Swinson's testimony on what happened in the parking lot differed. But ultimately, they both testified that Swinson shot Red in the neck after an argument had ensued. In response, McRoy grabbed Red's gun and started firing in Swinson's direction and Swinson continued to fire in McRoy's direction. McRoy's gun jammed, so he "ditched the gun" and ran out of the parking lot. RP (Oct. 30, 2023) at 674. Swinson got back into his car and drove away. Swinson did not call the police because he "wasn't supposed to have a gun." RP (Nov. 15, 2023) at 2086.

3

After the shooting, McRoy came back to the parking lot and found Red dead. McRoy put Red in his car and went to find help. McRoy eventually called 911 in a residential area nearby and police arrived at the scene. McRoy was then arrested and taken to the police station.

III.    SWINSON'S ARREST

Swinson proceeded to go to a nearby Safeway and pick up "another bottle of Hennessy" and started drinking. RP (Nov. 15, 2023) at 2086. Swinson then continued to drive around, drink, and then stopped at his grandmother's house.

Swinson left his grandmother's house and picked up some cocaine. Swinson then did more cocaine and continued to drink. Swinson stopped by his mom's house and "took "a few shots." RP (Nov. 15, 2023) at 2090. Swinson blacked out afterward.

While on patrol that evening, Officer Shawn Gustason saw a vehicle matching a description of Swinson's vehicle. When Gustason pulled up to the vehicle, he confirmed that the car belonged to Swinson. Swinson took off, and Gustason notified dispatch and engaged in pursuit.

Swinson crashed his vehicle shortly after and ran away to a nearby neighborhood. Several officers accompanied by Ronja, a K-9 dog, were deployed to locate Swinson. One officer spotted "Swinson underneath [a] vehicle." RP (Nov. 8, 2023) at 1785.

As the officers approached the vehicle Swinson was hiding under, they instructed him to show them his hands. Swinson responded by shooting at the officers. Officers returned fire and shot Swinson.

Swinson was shot several times and was subdued. Swinson was provided with first aid and then taken to the hospital. None of the officers were injured, but Ronja was shot several times and died from her wounds.

The State charged Swinson with one count of murder in the second degree, three counts of assault in the first degree, one count of harming a police dog, and one count of unlawful possession of a firearm in the second degree. All applicable counts included firearm enhancements.

IV.    SWINSON'S TRIAL

Swinson pled guilty to the one count of unlawful possession of a firearm in the second degree. But Swinson contested all other charges and specifically, he argued that he was justified in killing Red because it was in self-defense.

A.    McRoy's Video Interview

Later in trial, the State sought to admit a video interview of McRoy that was taken several hours after the shooting. The video shows McRoy alone in an interview room talking to himself. After nearly four minutes of pacing about the interview room alternating between expressing anger and sadness, McRoy repeatedly called Swinson numerous racial slurs, including: "nigg*," a "bitch ass nigg*," a "ho ass nigg*," a "hating ass nigg*," and a "monkey ass." Ex. 413. McRoy also said that Swinson was a "bitch," a "sick bitch," a "hater," and "on some weird shit." Ex. 413.

In one instance, McRoy, when referring to Swinson, repeatedly said, "nigg* was on some weird shit." Ex. 413, at 4 min. to 4 min. 17 sec. In another instance, McRoy exclaimed, "Why would you kill Jake, nigg*? . . . What the f*ck would you kill him for?" Ex. 413, at 4 min. 30 sec. to 4 min. 44 sec. McRoy also said "rot in jail, nigg*." Ex. 413, at 9 min. 25 sec.

Toward the end of the video, McRoy stopped talking about Swinson, leaned against the wall, and began crying about Red's death.

Outside the jury's presence, the State argued that it was admissible to illustrate McRoy's credibility by showing his state of mind after the shooting. The State said,

> I think it's pretty clear why [the video] is relevant in a case like this, self-defense homicide, where Mr. Swinson has made an offer of proof that [McRoy] [was] the one that initiated this whole thing by asking for a gun.
>
> His state of mind about three hours after the homicide occurred, I think, is relevant.

RP (Oct. 30, 2023) at 629.

Swinson objected to the admission of the video, arguing that it was inadmissible for several reasons. First, Swinson argued that the video was not relevant because there was no element of the crimes charged where "McRoy's state of mind" was at issue. RP (Oct. 30, 2023) at 624. Second, Swinson explained that it did not make sense to show the video when McRoy could testify about what happened. And third, Swinson claimed that there was almost no probative value to admitting the video, and it was overly prejudicial because McRoy was using "racial slur[s] over and over" and "discussing Mr. Swinson's character." RP (Oct. 30, 2023) at 625. Swinson requested a limiting instruction in the event that the court admitted the video.

The court ultimately admitted the video for the limited purpose of illustrating McRoy's state of mind and not for the contents of its truth. At no point did the court engage in a ER 403 analysis despite Swinson explicitly arguing that the video was overly prejudicial.

When asking McRoy about the video, the prosecutor asked McRoy "whether [he was] particularly upset [during the video?]" RP (Oct. 30, 2023) at 702. McRoy responded in the affirmative.

Then, before admitting the video, the court said,

> Ladies and gentlemen, I'm going to allow the video to be played for limited purposes. This evidence consists of a view and an audio of [McRoy].
>
> Those things that are said by the witness in terms of—that are audible are not allowed for the purpose of proving the elements of the items stated. Rather, I'm allowing this evidence to demonstrate or to show the witness's state of mind at the time he was making the statements.

6

You are not to discuss the evidence during your deliberations in any manner that is inconsistent with this admonishment.

RP (Oct. 30, 2023) at 703-04.  No efforts were made to redact portions of the video where McRoy called Swinson racial slurs.

B.      Closing Arguments

During the State's closing argument, the prosecutor referenced the video of McRoy's interview.  The prosecutor said,

Mr. McRoy's emotions mere hours after the incident are more credible than the testimony three and a half years later from Mr. Swinson about a made-up claim of self-defense.  I mean, what else are you going to say?  [Swinson] had to have a reason to shoot [Red], so he put  a fake gun in his hand to claim self-defense, but it wasn't self-defense.  It was an ambush.

RP (Nov. 16, 2023) at 2219.

The jury convicted Swinson of one count of murder in the second degree, two counts of assault in the first degree, one count of assault in the second degree, and one count of harming a police dog.  The jury returned a special verdict for all counts, finding that Swinson was "armed with a firearm at the time of the commission of the crime."  Clerk's Papers (CP) at 250-54.  And the jury also returned special verdicts on all three counts of assault, finding that Swinson committed the crimes "against a law enforcement officer who was performing his or her official duties at the time of the crime, and the defendant [knew that] the victim was a law enforcement officer."  CP at 247-49.

The trial court later sentenced Swinson to 774 months in confinement.

Swinson appeals.

ANALYSIS

II. THE TRIAL COURT ERRED IN ADMITTING MCROY'S INTERVIEW

Swinson argues that the trial court erred in admitting McRoy's video, entitling him to a new trial. We agree.

We review a trial court's ruling on admissibility of evidence for an abuse of discretion. *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). "Discretion is abused when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). We review the erroneous admission of evidence in violation of ER 403 under the nonconstitutional harmless error standard. *See State v. Gower*, 179 Wn.2d 851, 855, 321 P.3d 1178 (2014). This requires us to ask "whether there is a reasonable probably that, without the error, 'the outcome of the trial would have been materially affected.'" *Id.* at 854-55 (internal quotation marks omitted) (quoting *State v. Gresham*, 173 Wn.2d 405, 433, 269 P.3d 207 (2012)).

Evidence is only admissible if it is relevant. ER 402. Evidence is relevant if it tends to make any fact pertinent to the outcome of the case more or less probable. ER 401. Generally, the bar to admit relevant evidence is low, as even minimally relevant evidence is admissible. *Darden*, 145 Wn.2d at 621. But under ER 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." "'When evidence is likely to stimulate an emotional response rather than a rational decision, a danger of unfair prejudice exists.'" *State v. Beadle*, 173 Wn.2d 97, 120, 265 P.3d 863 (2011) (quoting *State v. Powell*, 126 Wn.2d 244, 264, 893 P.2d 615 (1995)).

A criminal defendant has a constitutional right to a fair trial. U.S. CONST. amend VI, XIV; WASH. CONST. art. I, § 22. "The promise of an impartial jury requires that the jury be unbiased

and unprejudiced." *State v. Bagby*, 200 Wn.2d 777, 787, 522 P.3d 982 (2023). "[A]llowing bias or prejudice *by even one juror* to be a factor in the verdict violates a defendant's constitutional rights and undermines the public's faith in the fairness of our judicial system." *State v. Berhe*, 193 Wn.2d 647, 658, 444 P.3d 1172 (2019) (emphasis added).

Here, the trial court failed to engage in the analysis required under ER 403, despite Swinson explicitly arguing that the video was overly prejudicial. That does not automatically amount to an abuse of discretion. *See State v. Gogolin*, 45 Wn. App. 640, 645, 727 P.2d 683 (1986) (explaining that a "reviewing court can decide issues of admissibility without the aid of an articulated balancing process on the record"). The record before us is sufficient for us to engage in our own ER 403 analysis.

Regardless of the State's purported theory for introducing McRoy's video, the video should not have been admitted. The justification put forth by the State for the admission of the video was that it showed McRoy was upset, and therefore credible, under ER 803(a)(3). At this point, McRoy's credibility had not been called into question, so the introduction of the video amounted to bolstering. *See State v. Stubsjoen*, 48 Wn. App. 139, 146, 738 P.2d 306 (1987) (holding that a phone call made by the defendant 1 1/2 hours after the underlying incident was not relevant to prove her state of mind at the time of the incident); 5C KARL B. TEGLUND & ELIZABETH TURNER, WASHINGTON PRACTICE: EVIDENCE LAW & PRACTICE § 803.16 (6th ed. 2025) (noting that a "statement may be irrelevant if it is too far removed from the time at which the declarant's state of mind was pertinent."). Even if the video was minimally probative of McRoy's state of mind, which we do not concede, its admission was nevertheless highly problematic.

"In cases where race should be irrelevant, racial considerations, in particular, can affect a juror's impartiality and *must be removed from courtroom proceedings to the fullest extent*

*possible.*" *State v. Monday*, 171 Wn.2d 667, 684, 257 P.3d 551 (2011) (Madsen C.J., concurring) (emphasis added) (quoting *State v. Varner*, 643 N.W.2d 298, 304 (Minn. 2002)). Race was wholly irrelevant in Swinson's trial. But because the trial court admitted McRoy's video, without making any effort to redact its contents, it opened the door and allowed race to creep in, casting doubt on the legitimacy of the proceedings. In other words, the trial court's decision permitted unfair prejudice that ER 403 prohibits.

In light of the risk this racially inflammatory evidence posed, it is unlikely that the limiting instruction given by the trial court alleviated any prejudice born by Swinson as a result of McRoy's video being admitted at trial. Consequently, there is a reasonable probably that, without the error, the outcome of the trial would have been materially affected. *Gower*, 179 Wn.2d at 855.

Therefore, we conclude that the trial court abused its discretion in admitting McRoy's video and the error was not harmless, entitling Swinson to a new trial.

## CONCLUSION

Accordingly, we reverse Swinson's convictions and remand for a new trial.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, C.J.

We concur:

_____
Maxa, J.

_____
Che, J.

10